No. 24-60462

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

STATE OF TENNESSEE, *et al.,*
*Plaintiffs-Appellees,*

v.

XAVIER BECERRA, *et al.,*
*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Southern District of Mississippi, No. 1:24cv161
Hon. Louis Guirola, Jr., United States District Judge

_____

## BRIEF OF AMICI CURIAE JUSTICE IN AGING, SAGE, AND THE CENTER FOR MEDICARE ADVOCACY IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

_____

CAROL A. WONG
(D.C. Bar No. 1035086)
cwong@justiceinaging.org
JUSTICE IN AGING
1444 Eye Street N.W., Suite 1100
Washington, DC 20005
Phone: (202) 289-6976
*Attorney for Justice in Aging*

HARVEY L. REITER
(D.C. Bar No. 232942)
*harvey.reiter@stinson.com*
SHELBY E. KOSTOLNI
*shelby.kostolni@stinson.com*
STINSON LLP
1775 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006
(202) 785-9100
*Attorneys for Amici Curiae Justice in Aging, et al.*

November 25, 2024

## STATEMENT OF IDENTIFICATION

Pursuant to this Court's Rule 29.2 and Federal Rule of Appellate Procedure 26.1, amici curiae Justice in Aging, SAGE, and the Center for Medicare Advocacy submit this supplemental certificate of interested persons to fully disclose all those with an interest in this brief and provide the required information as to their corporate status and affiliations.

    A.    Justice in Aging is a non-profit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

    B.    SAGE is a non-profit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

    C.    The Center for Medicare Advocacy is a non-profit, non-stock corporation. It has no parent corporation and no publicly traded corporation has an ownership interest in it of any kind.

Neither party's counsel authored the brief in whole or in part. Neither party nor their counsel contributed money that was intended to fund preparing or submitting the brief. No other person — other than the amicus curiae, its members, or its counsel — contributed money that was intended to fund preparing or submitting the brief.

**CERTIFICATE OF INTERESTED PERSONS**

No. 24-60462, State of Tennessee v. Becerra

**USDC No. 1:24cv161**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case, in addition to those listed in the briefs of the parties. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Bailey, Regan

Bers, Alice

Center for Medical Advocacy

Chan, Denny

Commonwealth of Kentucky

Commonwealth of Virginia

Griffin, Steven

Justice in Aging

Kean, Natalie

Kostolni, Shelby

Kwok, Wey-Wey

Reiter, Harvey

SAGE

State of Alabama

State of Georgia

State of Indiana

State of Kansas

State of Louisiana

State of Mississippi

State of Nebraska

State of Ohio

State of Oklahoma

State of South Carolina

State of South Dakota

State of Tennessee

State of West Virginia

Stinson LLP

Tax, Aaron

Wong, Carol


/s/ Harvey L. Reiter
HARVEY L. REITER

*Attorney for Amici Curiae Justice in Aging, et al.*

November 25, 2024

# TABLE OF CONTENTS

Page

STATEMENT OF IDENTIFICATION ................................................................. ii

CERTIFICATE OF INTERESTED PERSONS .................................................... iii

INTEREST OF AMICI CURIAE ........................................................................ 1

I.    The Court Should Vacate the District Court's Preliminary Injunction Because the Lower Court Failed to Consider the Harm to Transgender Older Adults. ............................................................................ 3

II.   Transgender Older Adults Experience Discrimination in Health Care Leading to Poor Health Outcomes. ........................................................ 4

III.  Transgender Older Adults Face Discrimination in Long-Term Care Facilities. ................................................................................................ 7

IV.   Transgender Older Adults Depend on Protections Against Discrimination When Accessing Long-Term Care Services through the PACE or Medicaid Programs. ........................................................... 9

V.    Transgender Older Adults Need Access to Gender-Affirming and Transgender-Friendly Health Care. ...................................................... 11

VI.   The Harm to Transgender Older Adults is Compounded for Those Who Face Intersectional Discrimination. .............................................. 14

VII.  Conclusion .............................................................................................. 15

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

**Statutes**

<u>42 U.S.C. § 18116</u> ...............................................................................3, 5, 6

**Other Authorities**

<u>42 C.F.R. § 460.98</u> ....................................................................................10

<u>42 C.F.R. § 460.112</u> ..................................................................................10

<u>45 C.F.R. §§ 92.1</u>, *et seq.* .............................................................................3

<u>45 C.F.R. § 92.101</u> ....................................................................................14

Nondiscrimination in Health Programs and Activities, <u>89 Fed. Reg.</u>
<u>37522</u> (May 6, 2024) ........................................................................3,14

AARP New York et al., *Disrupting Disparities Solutions for LGBTQ*
*New Yorkers Age 50+* (last visited Nov. 18, 2024),
<u>https://states.aarp.org/new-york/disrupting-racial-ethnic-disparities</u> ..................6

AARP Research, *Maintaining Dignity: Understanding and*
*Responding to the Challenges Facing Older LGBT Americans: An*
*AARP Survey of LGBT Adults Age 45-plus* (March 2018),
<u>https://www.aarp.org/content/dam/aarp/research/surveys_statistics/</u>
<u>life-leisure/2018/maintaining-dignity-lgbt.doi.10.26419-</u>
<u>2Fres.00217.001.pdf</u> .........................................................................4, 5

Asti, Emily, et al., *Transgender and gender diverse older people:*
*health, aging and dementia*, Int'l J. of Transgender Health (May
21, 2024), <u>https://doi.org/10.1080/26895269.2024.2355232</u> ............................13

Cai, Xiang, et al., *Benefit of Gender-Affirming Medical Treatment for*
*Transgender Elders: Later-Life Alignment of Mind and Body*,
LGBT Health at 37-38 (Jan. 2019),
<u>https://pmc.ncbi.nlm.nih.gov/articles/PMC6909671/</u> ..................................13, 14

Catlett, Lauren, et al., *End-of-Life Care for Transgender Older Adults*,
  Global Qualitative Nursing Res. (Mar. 23, 2023),
  https://pmc.ncbi.nlm.nih.gov/articles/PMC10041615/ ............................... 12, 13

Chidambaram, Priya & Burns, Alice, KFF, *How Many People Use
  Medicaid Long-Term Services and Supports and How Much Does
  Medicaid Spend on Those People?* (Aug. 14, 2023),
  https://www.kff.org/medicaid/issue-brief/how-many-people-use-
  medicaid-long-term-services-and-supports-and-how-much-does-
  medicaid-spend-on-those-people/ ....................................................... 11

CMS Medicare-Medicaid Coordination Office, *Factsheet: People
  Dually Eligible for Medicare & Medicaid* (Mar. 2020),
  https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-
  and-Medicaid-Coordination/Medicare-Medicaid-Coordination-
  Office/Downloads/MMCO_Factsheet.pdf; ......................................... 10

Foglia, Mary Beth & Fredriksen-Goldsen, Karen I.*, Health Disparities
  among LGBT Older Adults and the Role of Nonconscious Bias*,
  Hastings Ctr. Rep. (Mar. 2015),
  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4365932/#S1title ............... 4, 5

Fredriksen-Goldsen, Karen I., et al., *Physical and Mental Health of
  Transgender Older Adults: An At-Risk and Underserved
  Population*, The Gerontologist (Mar. 27, 2013),
  https://pubmed.ncbi.nlm.nih.gov/23535500/. ...................................... 5

Houghton, Angela, AARP Research, *Maintaining Dignity:
  Understanding and Responding to the Challenges Facing Older
  LGBT Americans: An AARP Survey of LGBT Adults Age 45-plus*
  (March 26, 2018), https://www.aarp.org/pri/topics/aging-
  experience/demographics/maintaining-dignity-lgbt/ .......................... 9

Howard, Susanna D., et al., *Healthcare Experiences of Transgender
  People of Color*, J. of Gen. Internal Med. (Aug. 5, 2019),
  https://pmc.ncbi.nlm.nih.gov/articles/PMC6816758/pdf/11606_201
  9_Article_5179.pdf ................................................................ 15

Hughto, Jaclyn M. W., et al., *Disparities in health condition diagnoses among aging transgender and cisgender medicare beneficiaries, 2008-2017*, Frontiers in Endocrinology (Lausanne) (Mar. 13, 2024),
https://pmc.ncbi.nlm.nih.gov/articles/PMC10040837 ......................................13

James, Sandy, et al., National Center for Transgender Equality, *Early Insights, A Report of the 2022 U.S. Transgender Survey* (February 2024), https://ustranssurvey.org/download-reports/. ...........................................6

Justice in Aging, et al., *LGBT Older Adults in Long-Term Care Facilities: Stories from the Field* (updated June 2015),
http://www.justiceinaging.org/wp-content/uploads/2015/06/Stories-from-the-Field.pdf ..........................................7

Kaiser Family Found., *Racial and Ethnic Health Inequities and Medicare* (Feb. 16, 2021),
https://www.kff.org/medicare/report/racial-and-ethnic-health-inequities-and-medicare/..................................................................7

Letter from Aaron Tax, SAGE to Melanie Fontes Rainer, Dir, Office for Civil Rights, HHS (Oct. 3, 2022),
https://www.regulations.gov/comment/HHS-OS-2022-0012-66783 ..................8

Letter from Rob Bonta, Cal. Att'y Gen., et al, to Xavier Becerra, Sec'y, HHS (Oct. 3, 2022),
https://www.regulations.gov/comment/HHS-OS-2022-0012-73216 ..................7

Medicaid.gov, *Long Term Services & Supports*,
https://www.medicaid.gov/medicaid/long-term-services-supports/index.html (last visited Nov. 22, 2024)...............................10

Medicaid.gov, *Program of All-Inclusive Care for the Elderly*,
https://www.medicaid.gov/medicaid/long-term-services-supports/program-all-inclusive-care-elderly/index.html (last visited Nov. 8, 2024) ...............................................................................9

Michael Adams and Ryn Skultety, SAGE & National Resource Center on LGBTQ+ Aging, *Building an LGBTQ+ Inclusive PACE Program* (Aug. 2023), https://www.sageusa.org/wp-content/uploads/2023/08/sage-pace-final.pdf....................................11

viii

Nirappil, Fenit, *For trans people, medical visits can be more traumatizing than healing*, Washington Post (Mar. 24, 2024, 6:00 AM)................................................................................................7

PBS News, LGBTQ seniors fear discrimination when searching for housing (Oct. 10, 2021), https://www.pbs.org/newshour/show/lgbtq-seniors-fear-discrimination-when-searching-for-housing........................................8

Proctor, Kimberly, et al., *Identifying the Transgender Population in the Medicare Program,* Transgender Health (2016), https://www.cms.gov/about-cms/agency-information/omh/downloads/identifying-the-transgender-population-in-the-medicare-program.pdf ...........................................13

Romanelli, Meghan & Lindsey, Michael A., *Patterns of Healthcare Discrimination Among Transgender Help-Seekers*, Am. J. of Preventative Med. at 128 (Apr. 2020), https://pubmed.ncbi.nlm.nih.gov/32001051/......................................15

SAGE & National Resource Center on LGBTQ+ Aging, *Facts on LGBTQ+ Aging* (Mar. 2021), https://lgbtagingcenter.org/library/item/facts-on-lgbtq-aging-2/.....................4, 8

Seelman, Kristie L., et al, *Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults*, Transgender Health (2017), https://pubmed.ncbi.nlm.nih.gov/28861545/ .............................5

UCLA Sch. of Law Williams Inst., LGBT Aging: A Review of Research Findings, Needs, and Policy Implications How Many Adults and Youth Identify as Transgender in the United States? (June 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf.......................................11, 12

Warner, David F. & Brown, Tyson H., Understanding How Race/Ethnicity and Gender Define Age Trajectories of Disability: An Intersectional Approach, 72 Soc. Sci. Med. 1236 (Apr. 2011). ...................14

Zbur, Rick, *Following a Stroke, She Woke Up in Men's Clothes: Why LGBTQ Seniors Deserve Equal Rights*, Cal. Health Rep. (Jul. 12, 2017), https://www.eqca.org/commentary-following-a-stroke-she-woke-up-in-mens-clothes-why-lgbtq-seniors-deserve-equal-rights/ ...................8

## INTEREST OF AMICI CURIAE

Justice in Aging is a national non-profit legal advocacy organization that fights senior poverty through law. Justice in Aging was founded in 1972 (originally under the name "National Senior Citizens Law Center") and maintains offices in Washington, D.C. and Los Angeles, California. Justice in Aging advocates for affordable health care and economic security for older adults with limited resources, focusing especially on populations that have traditionally lacked legal protection including lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") individuals.

SAGE is the country's oldest and largest organization dedicated to improving the lives of lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") older people. In collaboration with dozens of partners across the country, SAGE offers supportive services and resources to LGBTQ+ older people and their caregivers, advocates for public policy changes that address the needs of LGBTQ+ older people, and provides training for organizations that serve LGBTQ+ older people. As part of its mission, SAGE provides services to LGBTQ+ older people who face discrimination when they seek to access to health care. Given its extensive work with LGBTQ+ elders, SAGE is uniquely positioned to address the severe adverse effects that would result if the District Court's preliminary injunction remains in place.

The Center for Medicare Advocacy is a national, nonprofit law organization that works to advance access to comprehensive Medicare coverage, health equity,

and quality health care for older adults and people with disabilities. Founded in 1986, the Center advocates on behalf of beneficiaries in administrative and legislative forums and serves as legal counsel in litigation of importance to Medicare beneficiaries and others seeking health care coverage. It advocates for equitable coverage of and access to necessary health care for all who rely on Medicare.

Amici are organizations that represent the interests of older adults, including transgender older adults. We file this brief because the Court's decision about the preliminary injunction will affect whether transgender older adults will be unlawfully denied non-discriminatory access to health care.

I.    **THE COURT SHOULD VACATE THE DISTRICT COURT'S PRELIMINARY INJUNCTION BECAUSE THE LOWER COURT FAILED TO CONSIDER THE HARM TO TRANSGENDER OLDER ADULTS.**

Section 1557 of the Patient Protection and Affordable Care Act strikes down barriers to health care by prohibiting discrimination on the basis of age, disability, sex, national origin, race, or color in the provision of health care services. 42 U.S.C. § 18116(a). In this landmark provision, Congress recognized the importance of access to health care for everyone. Since 2010, transgender older adults and others have depended on this law to ensure protection from discrimination and gain access to quality, affordable health care.

In April 2024, the Department of Health and Human Services issued a final rule implementing Section 1557 of the Affordable Care Act that clarified the anti-discrimination protections required by the statute (the "Final Rule"). 45 C.F.R. §§ 92.1, *et seq*. The Final Rule includes provisions that ensure that anyone seeking health care services, including transgender older adults, can do so without facing discriminatory denial or barriers.

The District Court's preliminary injunction barring inclusion of discrimination on the basis of gender identity as a form of sex discrimination failed to consider the rule's conclusive findings about the unique and considerable barriers that transgender persons face in accessing health care, and the dire consequences that can result from the denial of critical health care. *See, e.g.*, *Nondiscrimination in*

*Health Programs and Activities*, 89 Fed. Reg. 37522 at 37595 (May 6, 2024) (agreeing with commenters "that the nondiscrimination protections are important to transgender and nonbinary people's ability to access clinically appropriate care, especially those who may face elevated risk of harm due to discrimination on multiple protected bases."). The lower court did not consider the devastating effects the preliminary injunction would have on transgender older adults who experience significant barriers to care, health disparities, and high rates of poverty.[1] The District Court also failed to recognize transgender older adults' needs for gender-affirming care and transgender-friendly long-term services and support.[2]

## II.     TRANSGENDER OLDER ADULTS EXPERIENCE DISCRIMINATION IN HEALTH CARE LEADING TO POOR HEALTH OUTCOMES.

Transgender older adults are often provided inadequate health care or denied care altogether, which often leads to an avoidance of care due to fears of mistreatment.[3] According to a survey by AARP, 66% of gender expansive persons (which includes transgender individuals)[4] aged 45 and older are concerned that their

---

[1] *See generally* SAGE & National Resource Center on LGBTQ+ Aging, *Facts on LGBTQ+ Aging* (Mar. 2021), https://lgbtagingcenter.org/library/item/facts-on-lgbtq-aging-2/.

[2] *See generally id.*

[3] *See* Mary Beth Foglia & Karen I. Fredriksen-Goldsen*, Health Disparities among LGBT Older Adults and the Role of Nonconscious Bias*, Hastings Ctr. Rep. at 3 (Mar. 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4365932/#S1title.

[4] "Gender expansive includes participants who identify as transgender and non-binary, including transgender, trans woman, trans man, intersex, non-binary,

health care will be impacted by their gender identity, 75% are concerned that health care providers are not sensitive to their needs, and 70% fear they will have to hide their gender identity in long-term care settings.[5] In another study, 40% of transgender older adults feared accessing health care services outside their community.[6] This fear of disclosing their gender identity or sexual orientation to their health care provider suggests that "shared decision-making during the clinical encounter is likely to be compromised, thereby contributing to the perpetuation of health inequalities among LGBTQ+ older adults."[7]

---

genderqueer, and gender fluid." AARP Research, *Maintaining Dignity: Understanding and Responding to the Challenges Facing Older LGBT Americans: An AARP Survey of LGBT Adults Age 45-plus*, at 3 (March 2018), https://www.aarp.org/content/dam/aarp/research/surveys_statistics/life-leisure/2018/maintaining-dignity-lgbt.doi.10.26419-2Fres.00217.001.pdf.

[5] AARP Research, *Maintaining Dignity: Understanding and Responding to the Challenges Facing Older LGBT Americans: An AARP Survey of LGBT Adults Age 45-plus*, at 10 (March 2018), https://www.aarp.org/content/dam/aarp/research/surveys_statistics/life-leisure/2018/maintaining-dignity-lgbt.doi.10.26419-2Fres.00217.001.pdf.

[6] Karen I. Fredriksen-Goldsen, et al., *Physical and Mental Health of Transgender Older Adults: An At-Risk and Underserved Population*, The Gerontologist, at 493 (Mar. 27, 2013), https://pubmed.ncbi.nlm.nih.gov/23535500/.

[7] Mary Beth Foglia & Karen I. Fredriksen-Goldsen*, Health Disparities among LGBT Older Adults and the Role of Nonconscious Bias*, Hastings Ctr. Rep. at 3 (Mar. 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4365932/#S1title; *see also* Kristie L. Seelman, et al, *Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults*, Transgender Health at 25 (2017), https://pubmed.ncbi.nlm.nih.gov/28861545/ (discussing the relation between fear of discrimination and poor health indicators).

Their concerns are reality. Based on a recent, national survey of transgender adults, "[o]f those who saw a health care provider within the last 12 months, nearly one-half (48%) reported having at least one negative experience because they were transgender, such as being refused health care, being misgendered, having a provider use harsh or abusive language when treating them, or having a provider be physically rough or abusive when treating them."[8] Not surprisingly, "[n]early one-quarter of respondents (24%) did not see a doctor when they needed to in the last 12 months due to fear of mistreatment."[9] In a survey of transgender New York City adult residents, about 70% of transgender and gender nonconforming respondents reported being denied equal treatment or being verbally or physically harassed in public spaces, including health care settings.[10] This is sex discrimination barred by Section 1557.

Aside from blatant mistreatment, transgender persons have challenges finding health care providers who are knowledgeable about their needs. "Nearly half (47 percent) of trans[gender] adults say the health-care providers they have come in contact with know 'not too much' or 'nothing at all' about providing health care to

---

[8] Sandy E. James, et al., National Center for Transgender Equality, *Early Insights, A Report of the 2022 U.S. Transgender Survey* at 16 (February 2024), https://ustranssurvey.org/download-reports/.

[9] *Id.*

[10] AARP New York et al., *Disrupting Disparities Solutions for LGBTQ New Yorkers Age 50+*, at 22 (last visited Nov. 18, 2024), https://states.aarp.org/new-york/disrupting-racial-ethnic-disparities.

trans[gender] people."[11] Even with protections in place, transgender older adults face challenges in obtaining healthcare. This discrimination frequently leads to poorer health outcomes: "[t]ransgender older adults are at significantly higher risk of poor physical health, disability, depressive symptomatology, and perceived stress, and suffer from fear of accessing health services, lack of physical activity, internalized stigma, victimization, and lack of social support."[12] The Final Rule is critical in closing the health care gap for transgender older adults.

## III.   TRANSGENDER OLDER ADULTS FACE DISCRIMINATION IN LONG-TERM CARE FACILITIES.

Transgender older adults often experience discrimination in long-term care facilities, the effects of which extend to their loved ones.[13] Without anti-discrimination protections, transgender older adults in long-term care facilities can be subjected to uninformed or hostile caregivers or guardians, including transgender older adults being placed in facilities registered under the incorrect gender or being

---

[11] Fenit Nirappil, *For trans people, medical visits can be more traumatizing than healing*, Washington Post (Mar. 24, 2024, 6:00 AM), https://www.washingtonpost.com/health/interactive/2023/transgender-health-care/.

[12] Letter from Rob Bonta, Cal. Att'y Gen., et al, to Xavier Becerra, Sec'y, HHS, at 12 (Oct. 3, 2022), https://www.regulations.gov/comment/HHS-OS-2022-0012-73216.

[13] Justice in Aging, et al., *LGBT Older Adults in Long-Term Care Facilities: Stories from the Field* (updated June 2015), http://www.justiceinaging.org/wp-content/uploads/2015/06/Stories-from-the-Field.pdf.

continually ridiculed by staff at the facility.[14] For example, in SAGE's comment letter regarding the Final Rule, it shared the experience of a transgender Asian American woman in her sixties who underwent facial feminization surgery.[15] A part of this surgery involved the Adam's apple (a tracheal shave), which had the temporary side effect of leaving the patient unable to speak following the surgery.[16] When she woke from her surgery unable to speak, multiple nurses misgendered and harassed her.[17]

Discrimination in long-term care settings remains prevalent, with some residential care communities making it clear they will not accept transgender people because of their gender identity.[18] That, again, is a form of sex discrimination prohibited by Section 1557. This type of discrimination can be more egregious for older adults residing in smaller cities and rural areas where there are fewer long-term

---

[14] Rick Zbur, *Following a Stroke, She Woke Up in Men's Clothes: Why LGBTQ Seniors Deserve Equal Rights*, Cal. Health Rep. (Jul. 12, 2017), https://www.eqca.org/commentary-following-a-stroke-she-woke-up-in-mens-clothes-why-lgbtq-seniors-deserve-equal-rights/ (recounting a transgender woman's experience where her estranged family registered her as male at a long-term care facility after a stroke).

[15] Letter from Aaron Tax, SAGE to Melanie Fontes Rainer, Dir, Office for Civil Rights, HHS, at 2 (Oct. 3, 2022), https://www.regulations.gov/comment/HHS-OS-2022-0012-66783.

[16] *Id.*

[17] *Id.*

[18] *LGBTQ seniors fear discrimination when searching for housing*, PBS News Weekend (Oct. 10, 2021), https://www.pbs.org/newshour/show/lgbtq-seniors-fear-discrimination-when-searching-for-housing.

care facilities — they must either hide their gender identity to get needed health care, or delay or forgo care altogether. "The possibility of being forced to hide one's identity as a condition of receiving care is a concern for just under half of lesbian, gay and bisexual respondents and for 70% of transgender and gender expansive respondents."[19] Long-term care facilities are trusted facilities for many older adults, but not for transgender older adults who may experience discrimination in such facilities.

## IV. TRANSGENDER OLDER ADULTS DEPEND ON PROTECTIONS AGAINST DISCRIMINATION WHEN ACCESSING LONG-TERM CARE SERVICES THROUGH THE PACE OR MEDICAID PROGRAMS.

The District Court explicitly enjoined the prohibition of discrimination on the basis of gender identity as a form of sex discrimination in the rules specifically applicable to Programs for All-Inclusive Care for the Elderly ("PACE").[20] 42 C.F.R.

---

[19] Angela Houghton, AARP Research, *Maintaining Dignity: Understanding and Responding to the Challenges Facing Older LGBT Americans: An AARP Survey of LGBT Adults Age 45-plus* (March 26, 2018), https://www.aarp.org/pri/topics/aging-experience/demographics/maintaining-dignity-lgbt/.

[20] PACE is a Medicare program which "provides comprehensive medical and social services to certain frail, community-dwelling elderly individuals, most of whom are dually eligible for Medicare and Medicaid benefits. An interdisciplinary team of health professionals provides PACE participants with coordinated care. For most participants, the comprehensive service package enables them to remain in the community rather than receive care in a nursing home." Medicaid.gov, *Program of All-Inclusive Care for the Elderly*, https://www.medicaid.gov/medicaid/long-term-services-supports/program-all-inclusive-care-elderly/index.html (last visited Nov. 8, 2024).

§§ 460.98 & 460.112. Medicaid and PACE provide vital coverage for many older adults with low incomes, including transgender older adults. The estimated 12 million people dually-eligible for both Medicare and Medicaid are disproportionately low-income, people of color, disabled, and in poorer health.[21] A disproportionate share of transgender older adults live in poverty as compared to the general population.[22] Long-term services and supports under Medicaid include care provided in facilities or in home and community-based settings. They span a wide range of services that help older adults and people with disabilities live more independently by assisting them with personal needs including assistance with getting dressed, transferring to a wheelchair, or eating. Medicaid is the primary payer of long-term care.[23] Access to long-term care is one of the most common reasons an

---

[21] CMS Medicare-Medicaid Coordination Office, *Factsheet: People Dually Eligible for Medicare & Medicaid* (Mar. 2020), https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/Downloads/MMCO_Factsheet.pdf; Kaiser Family Found., *Racial and Ethnic Health Inequities and Medicare* (Feb. 16, 2021), https://www.kff.org/medicare/report/racial-and-ethnic-health-inequities-and-medicare/.
[22] *See* SAGE & National Resource Center on LGBTQ+ Aging, *Facts on LGBTQ+ Aging* at 4 (Mar. 2021), https://lgbtagingcenter.org/wp-content/uploads/2024/06/SAGE-LGBTQ-Aging-Final_rvsd-3_20231.pdf.
[23] Medicaid.gov, *Long Term Services & Supports*, https://www.medicaid.gov/medicaid/long-term-services-supports/index.html (last visited Nov. 22, 2024).

individual enrolls in Medicaid, and such care is disproportionately utilized by older adults and people with disabilities.[24]

Because of the daily and personal nature of the services provided in long-term care programs — including that the services are sometimes provided in the enrollee's own home or other intimate settings — it is essential that the persons receiving such services have comprehensive protection under PACE's anti-discrimination provisions. PACE in particular only serves older adults who need long-term care and is particularly important for those who do not have family caregivers. LGBTQ+ older adults, including transgender older adults, generally have less access to informal caregiving to provide long-term care services compared to the rest of the population, making them more reliant on programs like Medicaid and PACE.[25]

## V.   TRANSGENDER OLDER ADULTS NEED ACCESS TO GENDER-AFFIRMING AND TRANSGENDER-FRIENDLY HEALTH CARE.

Approximately 1.3 million persons (0.5% of the adult U.S. population) identify as transgender.[26] Like the general U.S. population, the transgender

---

[24] *See* Priya Chidambaram & Alice Burns, KFF, *How Many People Use Medicaid Long-Term Services and Supports and How Much Does Medicaid Spend on Those People?* (Aug. 14, 2023), https://www.kff.org/medicaid/issue-brief/how-many-people-use-medicaid-long-term-services-and-supports-and-how-much-does-medicaid-spend-on-those-people/.

[25] Michael Adams and Ryn Skultety, SAGE & National Resource Center on LGBTQ+ Aging, *Building an LGBTQ+ Inclusive PACE Program* at 3 (Aug. 2023), https://www.sageusa.org/wp-content/uploads/2023/08/sage-pace-final.pdf.

[26] UCLA Sch. of Law Williams Inst., *LGBT Aging: A Review of Research Findings, Needs, and Policy Implications How Many Adults and Youth Identify as*

population is aging. Among adults 65 and older, 0.3% (171,700 persons) identify as transgender.[27] As it does for everyone, health care for transgender individuals takes on an increasing importance with age. Accessing quality, needed health care, however, can be challenging for transgender older adults, who have already faced a lifetime of discrimination in many aspects of their lives.

Transgender-specific care needs of older adults includes access to gender-affirming and transgender-friendly care, such as gerontological nursing or long-term care. Gender-affirming care can include transition-related care such as hormone-based treatment or surgery. Transgender-friendly care is culturally and clinically competent health care. It can include a range of medical and non-medical services that ensure an affirming environment and recognize a person's gender identity. For transgender older adults, this can include long-term care facilities that recognize their gender identity and treat them with dignity and respect, involvement of chosen family members in health-care decision-making, or prioritization of daily shaving for transgender women.[28]

---

*Transgender in the United States?* at 4 (June 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf.

[27] *Id.* at 5.

[28] Lauren Catlett, et al., *End-of-Life Care for Transgender Older Adults*, Global Qualitative Nursing Res. at 1 (Mar. 23, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10041615/.

Transgender older adults are frequently denied gender-affirming care, including gender-affirming surgery or hormone treatments, despite the medical necessity of this care.[29] Studies show that when transgender older adults cannot access health care, including due to discrimination, they experience higher rates of poor physical and mental health.[30] Transgender older adults experience poor health outcomes across 25 health conditions, including cancer, heart, lung, and kidney conditions, and infectious diseases.[31]

Transgender older adults who do receive gender-affirming care later in life experience significant benefits.[32] These benefits can include a significantly improved quality of life post-treatment, regardless of the age received.[33] In fact, older transgender adults may experience even greater improvement in quality of life

---

[29] *See id.* at 2.

[30] Emily Asti, et al., *Transgender and gender diverse older people: health, aging and dementia*, Int'l J. of Transgender Health at 24-25 (May 21, 2024), https://doi.org/10.1080/26895269.2024.2355232.

[31] Jaclyn M. W. Hughto, et al., *Disparities in health condition diagnoses among aging transgender and cisgender medicare beneficiaries, 2008-2017*, Frontiers in Endocrinology (Lausanne), Fig. 2 (Mar. 13, 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC10040837, *see also* Kimberly Proctor, et al., *Identifying the Transgender Population in the Medicare Program,* Transgender Health at 257 (2016), https://www.cms.gov/about-cms/agency-information/omh/downloads/identifying-the-transgender-population-in-the-medicare-program.pdf (using Medicare data to gain insight into the burden of chronic conditions and high rates of disability amongst transgender beneficiaries).

[32] Xiang Cai, et al., *Benefit of Gender-Affirming Medical Treatment for Transgender Elders: Later-Life Alignment of Mind and Body*, LGBT Health at 37-38 (Jan. 2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6909671/.

[33] *Id.*

from receipt of gender-affirming treatment than younger transgender adults.[34] Not every transgender older adult seeks gender-affirming care, but certainly those who do seek this care should not have hindered access to it.

## VI.  THE HARM TO TRANSGENDER OLDER ADULTS IS COMPOUNDED FOR THOSE WHO FACE INTERSECTIONAL DISCRIMINATION.

The Final Rule explicitly recognizes intersectional discrimination and the harms that stem from such discrimination. 45 C.F.R. § 92.101 (prohibiting discrimination on the listed bases "or any combination thereof . . . ."); *see also Nondiscrimination in Health Programs and Activities, supra,* 89 Fed. Reg. at 37572 (discussing examples in the health care context). Intersectional discrimination occurs when individuals face "simultaneous discrimination on more than one protected basis, including, but not limited to, discrimination against LGBTQI+ [lesbian, gay, bisexual, transgender, intersex, queer or questioning, and asexual] individuals of color, with disabilities, with LEP [limited English proficiency], or who are immigrants; and Black and Hispanic/Latino older adults." 89 Fed. Reg. 37572 (2024). The effects of intersectional discrimination on poor health outcomes are well established.[35]

---

[34] *Id.*

[35] *See* David F. Warner & Tyson H. Brown, *Understanding How Race/Ethnicity and Gender Define Age Trajectories of Disability: An Intersectional Approach*, 72 Soc. Sci. Med. 1236 (Apr. 2011).

For example, one study showed that transgender persons of color faced discrimination based on both their gender identity and race in health care settings, resulting in unique and "arguably more challenging healthcare experiences compared with their white transgender or cisgender racial/ethnic minority counterparts."[36] Participants in the study reported that when both transphobia and racism occurred, the resulting negative health care experiences were different as compared with experiencing either type of discrimination in isolation.[37] In fact, "[h]olding an additional marginalized identity (e.g., biracial and Native THSs [transgender help-seekers] or poverty-impacted THSs) was associated with increased risk for experiencing patterns of overt healthcare discrimination."[38] The harms from the preliminary injunction would be amplified for transgender older adults who also fall under other protected categories.

## VII.   CONCLUSION

Transgender older adults have experienced discrimination in healthcare settings. They should be able to access health care and long-term care to address

---

[36] Susanna D. Howard, et al., *Healthcare Experiences of Transgender People of Color*, J. of Gen. Internal Med. at 2073 (Aug. 5, 2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6816758/pdf/11606_2019_Article_5179.pdf.

[37] *Id.*

[38] Meghan Romanelli & Michael A. Lindsey, *Patterns of Healthcare Discrimination Among Transgender Help-Seekers*, Am. J. of Preventative Med. at 128 (Apr. 2020), https://pubmed.ncbi.nlm.nih.gov/32001051/.

their needs. They should have recourse when facing discriminatory barriers to receipt of such care, which the Final Rule clearly provides prohibits. For these reasons, the Court should vacate the District Court's preliminary injunction.

Dated: November 25, 2024

*/s/ Harvey L. Reiter*
HARVEY L. REITER
(D.C. Bar No. 232942)
Attorney of Record
harvey.reiter@stinson.com
SHELBY E. KOSTOLNI
shelby.kostolni@stinson.com
STINSON LLP
1775 Pennsylvania Avenue NW,
Suite 800
Washington, DC 20006
(202) 785-9100
*Attorney for Amici Curiae Justice in Aging, et al.*

CAROL A. WONG
(D.C. Bar No. 1035086)
cwong@justiceinaging.org
JUSTICE IN AGING
1444 Eye Street N.W., Suite 1100
Washington, DC 20005
Phone: (202) 289-6976
*Attorney for Justice in Aging*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of <u>Federal Rules of Appellate Procedure 29(a)(5)</u> and 32(a)(7) because the brief contains 3,206 words, excluding the parts of the brief exempt by <u>Federal Rule of Appellate Procedure 32(f)</u>.

This brief complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and the type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because it was prepared using Microsoft Word 2016 in Times New Roman 14-point, proportionally spaced typeface.

Dated:  November 25, 2024

*/s/ Harvey L. Reiter*

HARVEY L. REITER

*Attorney for Amici Curiae Justice in Aging, et al.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Fifth Circuit by using the

appellate CM/ECF system on November 25, 2024. Participants in the case who are

registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  November 25, 2024

*/s/ Harvey L. Reiter*

HARVEY L. REITER

*Attorney for Amici Curiae Justice in Aging, et al.*

18